## U.S. BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ALABAMA

IN RE:

JAMES E. TAIT,                                          Case No. 07-12174-MAM-11

       Debtor.

AMELIA TAIT DRISCOLL, as trustee of          Adv. Case No. 08-01015
the L.E. Tait Trust, PAULINE TAIT, SUELLEN
TAIT, and DEBORAH TAIT, beneficiaries of trust,

       Plaintiffs,

vs.

ULTIMATE RESERVE TRUST and
JAMES E. TAIT,

       Defendants.


## ORDER DECLARING MORTGAGE BETWEEN THE DEBTOR AND ULTIMATE RESERVE TRUST INVALID BUT IMPRESSING JAMES E. TAIT'S REMAINDER INTEREST IN THE TRUST WITH AN EQUITABLE LIEN

James L. Day, Memory & Day, Montgomery, AL, attorney for the Debtor, James E. Tait
B. Kincey Green, Jr., and Allen S. Reeves, Reeves & Stewart, P.C., Selma, AL, attorneys for the Plaintiffs
Timothy M. Lupinacci and James H. White, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Birmingham, AL, attorneys for the Defendant, Ultimate Reserve Trust
Andrew M. Cromer, attorney for Town & Country Bank

     This case is before the Court on the adversary proceeding filed by the Plaintiffs for a

determination of the validity/enforceability of a mortgage executed by James Tait, debtor/defendant,

1

as mortgagor, and Ultimate Reserve Trust, defendant.  The Court has jurisdiction to hear this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court.  This is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I), and the Court has authority to enter a final

order pursuant to 28 U.S.C. § 157(b)(2).  For the reasons indicated below, the Court concludes that

the mortgage between the Debtor, James E. Tait and Ultimate Reserve Trust is invalid as a mortgage

against the property owned by the L.E. Tait Trust and but concludes that Ultimate Reserve Trust

should have an equitable lien against the self-settled remainder interest of James E. Tait in the Trust

in the amount of $980,000, or to the extent of the interest's value, whichever is less.

### FACTS

The Debtor, James E. Tait, ("the Debtor" or "Tait") filed a voluntary chapter 11 bankruptcy

petition on August 7, 2007.  The Debtor's schedules state that Tait owns an equitable interest in  real

property that Tait uses as his personal residence, a renovated plantation home that has been in his

family since 1830.  The value listed reflects a one third equitable interest in the real estate.[1]  The

home and the surrounding land are held in a family trust, the L.E. Tait Trust, established by Tait's

parents.  The Debtor was previously the trustee of this trust.  While trustee, the Debtor mortgaged

the trust's real estate as part of a settlement of a lawsuit brought against Tait personally, and not

against the Trust, by Ultimate Reserve Trust.  The Debtor's schedules list the mortgage debt with

a value of $1,020,000.  The current trustee of the L.E. Tait Trust brought this adversary proceeding

against the Debtor and Ultimate Reserve Trust to determine the validity of the mortgage against  the

---

[1] The Debtor's schedules indicate that the property was appraised at $3,874,00.00, and he
lists a $1,645,000.00 interest in the property.

2

Family Trust property. The details of the Family Trust and the Debtor's relationship and dealings with Ultimate Reserve Trust are discussed below.

## A.

On October 6, 1978, L.E. Tait and Pauline Tait created a trust ("Tait Trust" or "Family Trust" or "Trust"). The trust instrument named the Debtor as trustee.[2] The trust instrument was recorded with the county probate office in Wilcox County on October 12, 1978. The Family Trust was created to pay income to L.E. Tait and his wife, Pauline, during their lives (and for the benefit of Suellen, if necessary) with the remainder of the trust to be distributed to their children, David Harold Tait, James Edwin Tait, Deborah Elizabeth Tait Crocker, Albert Lucas Tait, and Suellen Tait, (or their issue) at the death of the senior Taits. Mr. Tait died shortly after the Trust was established. Mrs. Pauline Tait is still living. Suellen suffers from a disability that prevents her from living independently.

The trust agreement contains the following provisions that are relevant to this case:

> In order to carry out the purposes of this Trust Agreement, the Trustee, in addition to all other powers granted by law, shall have the following powers and discretion:

Article IV
(1)     To continue to hold any and all property received by the Trustee or subsequently added to the trust estate or acquired pursuant to proper authority if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the trust.
(2)     To invest and reinvest in every kind of property, real, personal, or mixed, and every kind of investment, specifically including, but not by way of limitation, corporate obligations of every kind, and stocks, preferred or common, which men of prudence, discretion, and intelligence acquire for their own accounts

---

[2] At the time the Family Trust was created, the Debtor was a certified public accountant and about to graduate from law school.

3

without regard to any principle of diversification and without being confined to legal investments.

*   *   *

(6)      To sell for cash or on deferred payments and on such terms and conditions as are deemed appropriate by the Trustee, whether at public or private sale, to exchange, or to convey any property of the trust estate.

*   *   *

(10)      To manage, control, improve, and repair real and personal property belonging to the trust estate.

(11)      To partition, divide, subdivide, assign, develop, and improve any trust property; to make or obtain the vacation of plats and adjust boundaries or to adjust differences in valuation on exchange or partition by giving or receiving consideration; and to dedicate land or easements to public use with or without consideration.

(12)      To make ordinary and extraordinary repairs and alterations in buildings or other trust property, to demolish and improvements, to raze party walls or buildings, and to erect new party walls or buildings as the Trustee deems advisable.

(13)      To borrow money for any trust purpose from any person, firm, or corporation, including one acting as Trustee hereunder, on the terms and conditions deemed appropriate by the Trustee, and to obligate the trust estate for repayment; to encumber the trust estate or any of its property by mortgage, deed of trust, pledge, or otherwise, using whatever procedures to consummate the transaction deemed advisable by the Trustee; and to replace, renew, and extend any encumbrance, and to pay loans or other obligations of the trust estate deemed advisable by the Trustee.

*   *   *

(19)      To commence or defend at the expense of the trust estate any litigation affecting the trust or any property of the trust estate deemed advisable by the Trustee.

*   *   *

(23)      To do all the acts, to take all the proceedings, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have, subject always to the discharge of his fiduciary obligations. The enumeration of certain powers in this Trust Agreement shall not limit the general or implied powers of the Trustee, and the Trustee shall have all additional powers that may now or hereafter be conferred on it by law or that may be necessary to enable the Trustee to administer the trust in accordance with the provisions of the Trust Agreement, subject to any limitations specified in the Trust Agreement.

*   *   *

Article V

4

Case 08-01015   Doc 32   Filed 09/10/08   Entered 09/10/08 10:45:49   Desc Main
Document   Page 4 of 37

No one dealing with the Trustee need inquire concerning the validity of anything he purports to do, or need see to the application of any money paid or any property transferred to or on the order of the Trustee.

No Trustee appointed under the Trust Agreement shall at any time be held liable for any action or default of himself or his agent or of any other person in connection with the administration of the trust estate, unless caused by his own gross negligence or by a willful commission by him of an act in breach of trust.

*   *   *

Article VI

It is intended by the Settlors that this trust be in compliance with the rule against perpetuities and in no way violate the applicable statutes of the Code of Alabama.

*   *   *

Article VII

No interest in income or principal shall be alienated, encumbered, or otherwise disposed of by any income or remainder beneficiary while in the possession and control of the Trustee, and if any of them should attempt to alienate, encumber, or dispose of all or part of the income or grants of principal before the same has been delivered by the Trustee, or if by reason of bankruptcy or insolvency or any attempted execution, levy, attachment, or seizure of any assets remaining in the hands of the Trustee under claims of creditors or otherwise, all or any part of such income or principal might fail to be enjoyed by some other person, then such interest shall terminate.

At the time of creation, the Family Trust corpus consisted solely of real property of approximately 1000 acres. This included: (1) a home and approximately 90 acres known as the Coy Property; (2) 400-500 acres of property contiguous to the Coy Property; (3) 200-300 acres known as the Cemetery Property; (4) a historic plantation home and approximately 300 acres of property separated by County Road 12 known as Dry Fork.

Around 1980 or 1981, the Family Trust sold all the real property, except for approximately 10 acres of the Coy Property and the home on the Coy Property, to two of the Family Trust's beneficiaries, David Harold Tait and Albert Lucas Tait. The Family Trust retained a right of first refusal to repurchase the properties in the event that the property was to be sold to a third party. The Trust received approximately $200,000 from the sale. The sale proceeds were used to pay estate

5

taxes, and the remainder, approximately $60,000, was invested in securities. The sale transaction

provided that David and Albert relinquished their rights as beneficiaries under the Family Trust.

Therefore, since 1980 or 1981, only Pauline Tait, James, Deborah and Suellen have been and

presently are beneficiaries of the Trust. The trust corpus grew to approximately $500,000 by the early

1990s due to the investments made from the sales proceeds.

In 1991, when the brothers offered Dry Fork for sale, Tait, as trustee, exercised the Family

Trust's right of first refusal when an offer to purchase was made and repurchased the Dry Fork

property from his brothers for approximately $175,000. It was Tait's testimony that Dry Fork has

significant sentimental value to the family and that was the reason he repurchased the property. Tait

further testified that he did not get written consent from any of the remaining beneficiaries before

using trust assets to repurchase the property, but he was confident that they were aware of the

transaction.

When the Family Trust repurchased Dry Fork, it was in need of repairs. In 1998 or 1999, the

Family Trust, through Tait as Trustee, undertook renovating the property. Tait explained that the

purpose of the Family Trust was to provide for the family. He characterized the improvements to

Dry Fork as a way to care for the family and the improvements were, therefore, authorized under the

Family Trust. The improvements to Dry Fork, according to Tait, created a place where the family

could live together. Tait intended to live at Dry Fork at the time the renovations began and does

currently reside there as does his sister, Deborah, who lives in the apartment above the barn. It was

also planned that the improvements would allow for Tait's incapacitated sister, Suellen, to live with

him, his family, and his sister Deborah and be cared for once their mother was deceased.

6

With these purposes in mind, Dry Fork was completely renovated. Fifteen acres of land were clearcut; the plaster from the walls of the home was removed and replaced; the roof, floors, fixtures, plumbing and wiring were replaced. There were also many additions to the home including wings on each side of the home increasing the square footage to 12,000 square feet, a garage, a pool, a 3,000 square foot pool house, and a barn with a 3,000 square foot upstairs apartment. The fifteen acres were also landscaped. There is some discrepancy as to exactly how much money was spent on improvements to Dry Fork, but everyone agrees it was over $4,000,000.[3] At the time of the renovation, the Family Trust consisted of approximately $500,000.00 in assets. The Trustee financed the improvements through sale of timber from the land for $200,000-$300,000, a construction loan from Town and Country Bank (ultimately paid in part by sale of $500,000.00 of trust securities) and payment by Tait and his wife personally of the bulk of the costs. Tait testified that no one objected to his actions or use of trust assets to make these improvements, and no one suggested that he had overstepped his authority as Trustee. After the liquidation of $500,000 of the Family Trust's securities, there was no income for the beneficiaries. Tait's mother did inquire about when the income would resume. However, she was not in need of any distributions; she had adequate assets including her own home, personal property, and certificates of deposit.

Tait testified that he viewed all of the money he personally provided for improvements to the property as a future investment for him and his family.[4] He never considered it a gift to the Family

---

[3] Tait testified at trial that he spent over $4 million on improvements to Dry Fork. However, his testimony at his December 12, 2007 deposition was that he stopped counting how much money he spent on improvements after $6 million.

[4] Presumably because, at his mother's death, he will own 1/3 of the Trust assets outright.

7

Trust.  He considered all of his actions to be consistent with the his duties as Trustee of the Family Trust.

B.

At the time the improvements to Dry Fork began, Tait was employed by Vesta Insurance Group, Inc. (Vesta) (1999-2002).  He started working for Vesta as a consultant.  He was promoted to C.F.O., and later became chairman of the board of directors.  His income varied because it was a combination of salary, stock options, and bonuses; however, he received approximately $1,000,000 in annual income from Vesta each year he was employed by it.[5]  Tait founded Tait Advisory Services, an insurance consulting firm, while working at Vesta.  Other Vesta members owned shares in Tait Advisory Services, but in 2003 Tait bought all shares for $2,000,000, the book value of the shares, and Tait is now the sole owner of Tait Advisory Services.  The $2,000,000 used to fund the buyout was borrowed from Vesta, and Tait signed a promissory note agreeing to pay Vesta $166,666.66 for twelve months to pay off the note.

Tait left Vesta in 2002 and worked for Tait Advisory Services. Sometime before September 2005, Tait learned that American Resources Insurance Company (ARIC) might be available for purchase.  In September of 2005, Tait became chairman of the board of directors of ARIC and chairman of the board of directors of ARIC's parent company, American Resources Investment Company (AR Investment).  He was also chairman and C.E.O. of AR Holdings, Inc., the holding company of AR Investment.  At least while Tait was employed by ARIC, ARIC and its parent companies issued automobile insurance policies.  Ultimate Reserve Trust (URT)/Ultimate Warranty

---

[5] Vesta paid Tait a base salary of $500,000 to $600,000, and he was capable of earning bonuses to match his salary.

8

Corporation was created by ARIC to satisfy any claims on ARIC's issued auto policies.[6] Tait was one of three trustees for URT. Tait had access to and check writing authority for the accounts of ARIC and URT. In May of 2006, Tait was terminated as C.E.O. of ARIC after ARIC discovered that Tait had withdrawn $3,939,997 from the URT account.

ARIC brought a civil suit against Tait in June of 2006, alleging breach of fiduciary duty, fraud and suppression, breach of employment contract, ultra vires acts, replevin, and conversion. The suit alleged Tait, while with ARIC, acted outside of his authority as CEO by "entering into agreements with automobile warranty companies for ARIC to insure payments on vehicle service contracts issued to consumers," and, as sole signatory on the URT account, used monies in the URT account for improper purposes. Specifically, the complaint alleged that Tait purchased "land in the name of himself and his wife, [made] payments to a company owned and operated by Tait's brother, and [paid] himself money through a business or company named 'Tait Advisory Service.'"

After several weeks of negotiations, ARIC and Ultimate Warranty Trust settled their suit against Tait on November 17, 2006. In consideration of the release, Tait agreed to deliver $250,000.00 and the deed to approximately 120 acres of non-Trust property to URT. Tait also executed a promissory note for $980,000.00 and gave URT a second mortgage on Dry Fork, the Family Trust property, to settle the claims against him. The mortgage was signed by Tait individually, Tait's wife, and Tait, in his capacity as Trustee of the Family Trust. The parties were represented by counsel. The fact that Dry Fork was Trust property was known to all parties and is the reason that Tait signed the mortgage in his capacity as Trustee in addition to signing personally.

---

[6] The current trustee of URT testified at trial that Ultimate Reserve Trust and Ultimate Warranty Corporation are one entity. Therefore, the names will be used interchangeably.

The fact that the attorney for ARIC and URT knew of the Family Trust was confirmed by the current President of ARIC, Stephen Pate at trial. He testified that ARIC's attorney gave him a copy of the Trust instrument along with all other settlement documents at the time the settlement was executed. Tait's ability to pay the pledged note was also discussed between the parties, but no financial information or proof of his ability to pay was ever asked for or given to the parties to review before accepting the agreed upon settlement.

C.

A foreclosure notice for Dry Fork was published in July of 2007. This prompted Tait to conduct a family meeting in August of 2007 and to disclose his current financial situation and past financial decisions. Tait discussed whether he should resign as Trustee of the Family Trust.

On August 7, 2007, Tait filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. He listed Dry Fork as his residence and valued his interest as a one-third equitable interest. He listed the living and upkeep expenses he currently pays for his residence, Dry Fork. He also listed the mortgage to Ultimate Reserve Trust on his schedules as a secured claim. On December 15, 2007, Amelia Tait Driscoll (Driscoll), Tait's daughter, was appointed Trustee of the Family Trust when Tait resigned.

At some point in time between the August 2007 family meeting and Driscoll becoming Trustee of the Family Trust, Driscoll and Tait discussed Tait's attempted mortgage of Dry Fork to URT. Driscoll opined that the transaction was improper and unauthorized by the Family Trust document. She thought Tait's debt was solely a personal debt that could not be secured by Trust property.

10

On February 19, 2008, Driscoll, as the Trustee of the Family Trust, filed this adversary proceeding under Bankruptcy Rule 7001(2) against Tait and URT to determine the validity of the attempted mortgage that was executed to secure Tait's debt. The Family Trust claims that the mortgage is void because (1) Tait never owned and does not currently own a legal or equitable interest in Dry Fork; (2) the mortgage was to secure an antecedent debt that was a purely personal debt of Tait's; (3) the Family Trust does not allow a trustee to mortgage trust property to secure personal debts; (4) Alabama case law regarding fiduciary duties does not allow for a trustee to mortgage trust property to secure personal debts. URT counterclaimed alleging that while the Family Trust was the original owner of Dry Fork, Tait had exercised such control over the property, that he had succeeded to the Family Trust's interest in the property. Specifically, URT claimed that Tait made improvements to Dry Fork, without the knowledge or consent of beneficiaries, and mostly with non-trust funds and without consideration from the Family Trust.

The adversary proceeding was tried on July 17 and 18, 2008. The trial focused on URT's assertion that its mortgage was valid and that it was entitled to an equitable interest in Dry Fork due to its funds being used for Family Trust purposes and its theory that Dry Fork was no longer property of the Family Trust but was essentially personal property of Tait because of Tait's actions. The Family Trust took the position that Tait acted beyond his role as Trustee when he mortgaged Dry Fork to satisfy his personal debt, and, therefore, the mortgage between Tait and URT was void because it was unauthorized by the trust instrument.

D.

Driscoll, the current Trustee of the Family Trust, testified that since the renovations to Dry Fork, it is the gathering place for the entire family; they meet there for all holidays and

11

special occasions and even weddings. She stated that the entire family uses the property. She knew of no beneficiary objecting to the improvements or Tait's actions as Trustee prior to the foreclosure notice in July of 2007. She further testified that she did not know why anyone would complain. To her knowledge, no one knew of Tait mortgaging the property prior to August 2007 when Tait informed them. She opined that, while the Family Trust instrument allowed the trustee to mortgage Trust property for Trust purposes, Tait's mortgage of Dry Fork for a personal debt was not authorized by the Trust, was against state law regarding self-dealing and the fiduciary duties of trustees, and was void as a matter of law.

E.

URT presented evidence at trial of Tait making unauthorized distributions from the accounts of URT, ARIC, and AR Holdings to other accounts and to himself. URT established that Tait transferred $118,463 from AR Holdings, $86,468 from ARIC, and $20,000 from URT to himself and $55,404 from AR Holdings and $110,000 from URT to his consulting business, Tait Advisory Services. Beyond the amounts disbursed from the accounts, URT produced documents related to debts Tait had at the time money was taken from URT in an attempt to show a connection to the funds taken. URT contends that the money Tait took was disbursed, through what it considered traceable transactions, to the Family Trust, giving URT an equitable interest in the Family Trust. Some of the evidence presented by URT is detailed below.

On December 22, 2005, Vesta demanded payment from Tait of its promissory note. The original note stated that it wss due to mature on April 1, 2004. As of the date of the demand, Tait owed $1,753,368.90. Tait offered $300,000 as a compromise to settle the debt owed. The parties finally agreed that Tait would pay $850,000 to Vesta to settle the debt owed to it. Tait acknowledged

12

that he paid his debt of $850,000 owed to Vesta with funds of URT. This debt and its payment was not part of the Trust-related expenses paid by Tait that URT claims were paid with URT funds. URT does not claim that the payment of Vesta has anything to do with the Trust. This is the bulk of the money that Tait received from URT and for which the $980,000 mortgage was given.

URT questioned Tait's control of the Family Trust property by inquiring into payments for the upkeep of Dry Fork. According to Tait's bankruptcy schedules and Tait's testimony, he personally pays for the necessary upkeep of Dry Fork, including utilities and yard maintenance. URT questioned these payments by a chapter 11 debtor for property to which he does not hold title. Tait's response was that he was personally paying the same expenses that anyone would for his or her homestead.

Selected transfers and transactions by Tait in multiple business accounts that occurred on the same day were presented by URT as traceable distributions that created an equitable interest for URT in the Family Trust. On December 14, 2005, URT, through Tait, distributed $100,000 to AR Holdings; AR Holdings, through Tait, distributed $80,000 to Tait Advisory Services; Tait Advisory Services paid $73,875.55 to Town and Country Bank on a loan that benefitted the Family Trust. On January 20, 2006, URT, through Tait, distributed $45,000 to Tait Advisory Services, and Tait Advisory Services distributed $37,753 to Town and Country Bank that same day. On April 17, 2006, URT, through Tait, distributed $50,000 to ARIC; ARIC, through Tait, distributed $17,867 to Tait Advisory Services; Tait Advisory Services paid $37,853 to Town and Country Bank.

Tait was questioned about the multiple transfers to various entities that occurred on the same day. It was Tait's testimony that the same day transfers were reflective of his bookkeeping style; he did all his bookkeeping and check writing at one time for a period of time. It did not mean that the

13

transactions were necessarily related  He explained that he paid the Town and Country Bank loan because, although the Family Trust is the obligor on the note, he was also obligated personally.  He denied that the URT funds were taken to specifically pay the Family Trust debt despite the fact that checks were paid on the same day.  He explained all transfers to ARIC or AR Holdings were for a business purpose[7] and all transfers to Tait Advisory Services were temporary loans that he admittedly never repaid.

## LAW

Each party bears the burden of proving its claim by a preponderance of the evidence. *Auburndale State Bank v. Dairy Farm Leasing Corp*, 890F.3d 888, 893 (7th Cir. 1989( (stating "the party who would lose if no evidence were presented has the burden" in a declaratory judgment case); *Willcox v. State of South Carolina (In re Willcox)*, 329 B.R. 554, 562 (Bankr. S.C. 2005) (stating "the burden of proof in declaratory judgment actions lies, as a general principle of law, with the moving party who is held to 'have the risk of nonpersuasion'"). The Tait Trust, through Driscoll, bears the burden of proving the URT lien is void, and URT, pursuant to its counterclaim, must prove that the lien is valid.  This adversary proceeding is rooted in the language of the Family Trust instrument, trust law, mortgage and property law and the actions of James Tait.

The opinion is divided into 7 sections, each section addressing one of the issues raised. Part I will address the terms of the Tait Trust in general.  Part II will discuss who the settlors of the Tait Trust are.  Part III will address the status of the trust not settled by James Tait.  Part IV

---

[7] Tait linked some of the disbursements from the URT to ARIC to "true ups."  However, the testimony of Stephen Pate, the current President of ARIC, was that "true ups" are handled in a different manner; therefore, Tait's testimony is untrue.

14

will discuss what the import of being a settlor is for James Tait and how it affects the part of the Trust he self-settled. Part V will address how to calculate what James Tait's self-settled interest is. Part VI will discuss James Tait's ability to mortgage the Trust property for his personal debt. Part VII will discuss the validity of URT's counterclaim.

## I. The L.E. Tait Trust

The Family Trust is a valid trust created on October 6, 1978, in conformity with Alabama law. ALA. CODE 1975 § 19-3B-402. The Family Trust was filed of record in Wilcox County on October 12, 1978. The Family Trust gives the trustee broad powers to sell, purchase, invest, mortgage, encumber, improve, repair, demolish, partition, and divide the trust property. It gives the trustee the authority "[t]o do all the acts, to take all the proceedings, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have," but these powers are "subject always to the discharge of his fiduciary obligations." (L.E. Tait Trust Article IV).

From 1978 through December of 2007, Tait was the trustee of the Family Trust. During this time, Tait sold Trust property to his brothers, used Trust funds to pay taxes and repurchase Trust property, cut and sold timber on the Trust land, financed a loan with Town and Country Bank to fund improvements, and completely renovated Dry Fork, the bulk of the Trust corpus. All of these actions were proper under the Trust.

The controversy between the Trust and URT arises over how to treat the Trust property when James Tait acted both as trustee and for himself in regard to Dry Fork. Tait personally expended a substantial sum of money for the Dry Fork renovations. Once Tait put his own money into the Dry Fork renovations, did that action change the nature of the Trust property? Did the investment by Tait

Case 08-01015    Doc 32    Filed 09/10/08    Entered 09/10/08 10:45:49    Desc Main
Document       Page 15 of 37

become part of the value of the Trust or, as URT asserts, did Tait's beneficial interest become mortgageable to URT?

## II.  Settlors of the L.E. Tait Trust

Clearly L. E. Tait and Pauline Tait were the original settlors of the Tait Trust.  Under either the Alabama law of trusts before January 1, 2007, or under the new Alabama Uniform Trust Code, their initial contribution of land made them  "settlors" of the Trust to the extent of their contributions.

The RESTATEMENT (SECOND) OF TRUSTS § 3(1) (1959) defines a "settlor" as "one who . . . furnishes consideration for the creation of a trust."  See BLACK'S LAW DICTIONARY 1373(6th ed. 1990) and *Shurley v. Texas Commerce Bank-Austin (In re Shurley)*, 171 B.R. 769, 778 (Bankr. W.D. Tex. 1994), reversed and remanded on other grounds, 115 F.3d 115 333 (5th Cir. 1997).

The RESTATEMENT (SECOND) OF TRUSTS was used by Alabama Courts in interpreting trusts prior to January 1, 2007.  E.g., *Abston v. Estate of Abston*, 973 So.2d 1068, 1074 (Ala. Civ. App. 2007); *Baldwin v. Estate of Baldwin*, 875 So.3d 1138, 1140-41 (Ala. 2003); *Ex Parte SouthTrust Bank of Alabama, N.A.*, 679 So. 2d 645, 648 (Ala. 1996).[8]  Therefore, L.E. and Pauline Tait, by contributing their property were "settlors" under the common law of Alabama at the creation of the Trust.

Alabama enacted the Alabama Uniform Trust Code in 2006.  It became effective on January 1, 2007 and "applies to all trusts created before, on, or after January 1, 2007" and to "all judicial proceedings concerning trusts commenced on or after January 1, 2007" and "to trust instruments

---

[8] A Westlaw search contained 157 Alabama cases that mentioned the RESTATEMENT OF TRUSTS (includes Restatement (First), Restatement (Second) and Restatement (Third)).

executed before January 1, 2007, unless there is a clear indication of a contrary intent in the terms of the trust." ALA CODE §19-3B-1204(a). "[A]n act done before January 1, 2007, is not affected by [the new Code]." § 19-3B1204(a)(5). The Official Comment to the statute states that the new law

> is intended to have the widest possible effect within constitutional limitations. Specifically, the Code applies to all trusts whenever created, to judicial proceedings concerning trusts commenced on or after its effective date, and unless the court otherwise orders, to judicial proceedings in progress on the effective date. In addition, any rules of construction or presumption provided in the code apply to preexisting trusts unless there is a clear indication of a contrary intent in the trust's terms. By applying the code to preexisting trusts, the need to know two bodies of law will quickly lessen.

§ 19-3B1204(a)(5) "Official Comment." The Alabama Uniform Trust Code defines a "settlor" as " a person . . . who . . .contributes property to [] a trust." Ala. Code §19A-3B-103(16). Thus, under the new Alabama Uniform Trust Code, L.E. and Pauline Tait are "settlors" as well.

The same law applies to James Tait and any contributions he made to the Trust. James Tait testified that he spent at least $4,000,000 of his own money on Dry Fork improvements. Based on the $500,000 of investments that the Trust owned before the improvement of Dry Fork's buildings, and Tait's statements, there is no question but what that fact is true. The Trust, by itself, could not have raised sufficient cash to pay for the improvements and Tait admits he paid for the improvements from his own money. Therefore, James Tait "contributed" property to the Trust. He too is a "settlor." Under either the common law or the new Uniform Trust Code of Alabama, James Tait is a settlor of the L.E.Tait Trust to the extent of his contributions to it.

### III. Status of James Tait's Interest in the Trust Property
### Contributed by Other Settlors

Tait's beneficial interest in the trust assets placed in the Trust by L.E. and Pauline Tait is a 1/3rd remainder interest in the assets available at the death of Pauline Tait, his mother. Is this interest separate in any way from the interest that Tait self-settled into the Trust? According to the only case law the Court could find on the subject, the property in the Trust that was not contributed by James Tait is separate and is vested with all of the protections available to trust property under the common law and Alabama's Trust Code.

In *Shurley v. Texas Commerce Bank- Austin (In re Shurley)*, 115 F.3d 333 (5th Cir. 1997), the Fifth Circuit held that a debtor's interest in a family trust, to the extent it was not self-settled, was not subject to her creditors' claims in bankruptcy. 115 F.3d at 338 (stating that "the novel issue presented here is whether the entirety of a beneficiary's interest in a spendthrift trust is subject to creditors' claims where the trust is only partially self-funded by the beneficiary.") The Court reasoned that this result "would further the policy of allowing her parents to create a spendthrift trust for the benefit of Shurley that is protected from her creditors, while giving effect to the exception for self-settled trusts." *Id*. at 338. The case of *In re Johannes Trust*, 191 Mich. App. 514, 479 N.W. 2d 25, 29 (1991), also supports this view.

Texas and Michigan law, both common and codified, are similar enough to Alabama's law to support this result in this case as well. The result is fair and thoughtful. Thus, James Tait's interest in the original trust property is not affected by the self-settled status of his later contributions to the Trust.                    .

### IV.  The Import of Tait's Status as Settlor and How It Affects the the Self Settled Portion of the Trust

The Family Trust contains a spendthrift provision at Section VII. The spendthrift provision protects beneficiaries who are not settlors of the trust from claims of their creditors against trust property. ALA. CODE § 19-3B-502(a) (2008), Official Comment (stating that "a creditor of the beneficiary [of a spendthrift trust] is prohibited from attaching a protected interest"); *Menotte v. Brown (In re Brown)*, 303 F.3d 1261, 1265 (11th Cir. 2002) (citing Florida law for the general proposition that "trusts containing valid spendthrift provisions are protected from the reach of creditors, so long as the beneficiaries cannot exercise dominion over the trust assets"); RESTATEMENT (THIRD) OF TRUSTS § 58(1) (2008)(stating "Except . . . [as to settlors of trusts], if the terms of a trust provide that a beneficial interest shall not be transferable by the beneficiary or subject ot claims of the beneficiary's creditors, the restraint on voluntary and involuntary alienation of the interest is valid").

However, "[w]here a person creates for his own benefit a trust with a provision restraining the voluntary or involuntary transfer of his interest, his transferee or creditors can reach his interest." RESTATEMENT (SECOND) OF TRUSTS § 156(1) (2008); RESTATEMENT (THIRD) OF TRUSTS § 58 (2008) (stating "a restraint on the voluntary and involuntary alienation of a beneficial interest retained by the settlor of a trust is invalid"). *See also* ALA. CODE § 19-3B-505 (2008). The Alabama Uniform Trust Code states that "[t]o the extent a beneficiary's interest is not subject to a spendthrift provision, the court may authorize a creditor or assignee of the beneficiary to reach the beneficiary's interest by attachment of present or future distributions to or for the benefit of the beneficiary or other means." ALA. CODE § 19-3B-501 (2008). These statements "follow [] traditional doctrine in providing that a settlor who is also a beneficiary may not use the trust as a shield against the settlor's creditors." Official Comment to the Uniform Trust Code, Section 505 (as contained in Ala. Uniform

19

Trust Code § 19-3B-505 (2008)). The preCode law, common law, and Alabama's Uniform Trust Code all state that a settlor/beneficiary's interest may be reached by his creditors.

The case of *State v. Nashville Trust Co.*, 190 So.2d 785 (Tenn.Ct. App. 1945) is a case similar to this case. A father bought land that he told his son he intended to give to him at a later date in a spendthrift trust. Prior to actual execution of the trust, the son moved onto the land and made improvements to the property that far exceeded the value of the land. In fact, he built a "mansion" on the land–Brent-wood Hall. About one year after the son had completed the improvements on the property, the father conveyed the land to his son in a spendthrift trust. Later, the State of Tennessee attached the son's interest in the trust based upon a judgment it had obtained against the son.

The Tennessee court held that the son's interest in the trust could be reached by the State regardless of the spendthrift provisions in the trust.

> The case is very different when one takes his own property and undertakes to put it into a trust for his own benefit beyond the reach of his creditors. Such a trust would take from them what they would have had a right to look to for payment of their debts.

*Id* at 790. The case further stated:

> The effect of what . . .[the son] did in this case was to put $350,000 of his money into property to be put into a trust for himself beyond the reach of his creditors, present and prospective. . . The transaction would not be different in the view of equity if he had put his $350,000 into the property after, rather than before, it was given him in the spendthrift trust. That is, he contributed this amount to the trust property. Under all authorities, the trust is invalid to the extent of this contribution.

*Id*. at 790-91. Therefore, Tait is the settlor of the Family Trust to the extent of his contribution and the spendthrift clause does not protect his self-settled interest from creditors.

20

### V.  What is the "Interest" of James Tait that is Not Protected By the Spendthrift Clause

The Restatement of Trusts and the Alabama Uniform Trust Code both state that a settlor's "interest" in a trust is reachable by creditors, so does the Eleventh Circuit in interpreting Florida law. *Menotte v. Brown (In re Brown)*, 303 F.3d 1261, 1266-68 (11th Cir. 2002)(also citing the RESTATEMENT (SECOND) OF TRUSTS, SCOTT ON TRUSTS, and BOGERT ON TRUSTS as to the common law). What is the "interest" of a self-settlor in a trust?  Is it what the settlor/beneficiary contributed? Is it the interest that the settlor has in the trust by virtue of the trust's language even if that is less than the amount contributed to the trust by the settlor?

The Restatement (Third) of Trusts states, in Comment f to § 58:

> If a beneficiary transfers part of the property or supplies part of the consideration to fund a trust, the beneficiary is ordinarily a settlor to the extent of a fractional portion appropriate to reflect his or her proportionate share of the funding.

Further, Illustration 10 states:

> B's father F transferred $500,000 to T to be held by it in trust pursuant to the terms of an instrument executed by F and signed by him as settlor, and to pay the income to B for life, remainder at her death to her issue.  The terms of the trust included a spendthrift clause.  Upon learning of her father's plan to establish this trust, B contributed $250,000 of her own funds to the trust.  B is settlor of a one-third portion of this trust.  Her creditors or assignees can reach a one-third share of her income interest, while her right to income for the other two-thirds of the trust is protected by the spendthrift restraint.  (If, instead, B had made her $250,000 contribution to the trust at a later time, when the trust estate had appreciated by 50 percent to $750,000, she would become settlor of a one-quarter share of the then $1 million trust fund.)

The Court found no Alabama cases that dealt with this issue.  The Fifth Circuit has ruled that, under Texas law, a bankruptcy debtor's "interest" in a family trust that the debtor, Shurley, contributed to, to the extent of the contribution was not protected by a spendthrift clause, consistent with the RESTATEMENT (THIRD) OF TRUSTS quoted above. *Shurley v. Texas Commerce Bank-Austin,*

*N.A. (In re Shurley)*, 115 F.3d 333 (5th Cir. 1997). Her interest in the trust was a life estate in the income and a power of appointment over the remainder. Shurley had not exercised the power of appointment. The Court held that the portion of the trust that Shurley had contributed to it was the only portion reachable by creditors. *Id.* at 115 F.3d 338 (stating that "[a]llowing creditors to reach only the self-settled portion of the trust contributed by Shurley would further the policy of allowing her parents to create a spendthrift trust for the benefit of Shurley that is protected from her creditors, while giving effect to the exception for self-settled trusts"); *see also In re Johannes Trust*, 191 Mich. App. 514, 479 N.W. 2d 25, 29 (Mich. 1991).

The court concludes that the result in *Shurley* and *Johanne*s is appropriate. This result is also the result the RESTATEMENT (THIRD) OF TRUSTS dictates.

However, what does this mean in this case? Tait contributed, per the evidence, over $4,000,000 to the improvement of Dry Fork, Trust property. At the time of the improvements, the Family Trust was worth about $500,000. The Trust in its entirety was not valued at the time of the bankruptcy. Dry Fork was. Its value, according to Tait's bankruptcy schedules, was $3,874,000–less than the value of the improvements. What is the value of his "interest"? Does the fact that his interest is as a remainderman and not as an income beneficiary matter as well?

The *Johannes* case, *supra*, stated

[Th self-settlor's] creditors can reach the assets of the trust and compel payment in the maximum amount that would be in the trustee's discretion with respect to that portion of the assets that came from [the self-settlor], but not with respect to any portion of the trust that came from other individuals.

*Johannes,* at 479 N.W. 2d 29. The *Shurley* case held that Shurley, although only an income beneficiary under the trust could receive principal if the trustee deemed it appropriate. This power

22

to invade principal made all of the trust corpus (to the extent of Shurley's self-settled contribution) available to her creditors. *Shurley,* 115 F.3d 339-40.

An Eleventh Circuit case, interpreting Florida law, similarly holds. *Menotte v. Brown (In re Brown)*, 303 F.3d 1261 (11th Cir. 2002). Debtor Brown self settled an irrevocable trust. Brown gave the remainder interest in the trust to charity. She retained the right to receive trust income for life. When she filed bankruptcy, the Chapter 7 trustee sought to attach the trust assets for creditors. The 11th Circuit held that Ms. Brown's trust's spendthrift provision was invalid against creditor claims to the extent Brown had an interest in the trust property. "Where the only interest a settlor has retained for herself under a trust is the right to income for life, it is solely this interest which her creditors can reach." *Id.* at 303 F.3d 1268.

Tait has only a one-third remainder interest in the Family Trust. He has absolutely no right to income during the life of his mother, Pauline. Therefore, in line with the case law, Tait's interest in the trust (the portion he self-settled) is reachable by creditors (to the extent of his one-third interest), but payment must await his distribution upon his mother's death. The value of this interest is the proportional value his contribution to the trust bears to the other trust assets at the time of the filing of this case discounted by the fact that the assets will not be distributed until Pauline Tait's death and taking into account the fact that he will only receive a one-thrid interest.[9]

## VI. James Tait's Ability to Mortgage the Trust Property

The 11th Circuit's *In re Brown* case states the general rule that

---

[9] This opinion and the trial held did not deal with the issue of whether any of the contribution for the improvement of the property was a contribution by Mrs. James Tait and the court is making no findings on that issue.

23

> [A]lthough the spendthrift provision of a trust is void as against a settlor-beneficiary's creditors, the trust itself remains valid. . .Thus, although a settlor-beneficiary's creditors are not bound by a trust's spendthrift clause, the assets subject to attachment are circumscribed by the trust agreement.

*Brown*, 303 F.3d 1269-70. Thus, the L. E. Tait trust instrument itself must be examined in light of Alabama trust law to determine whether the mortgage was valid and Tait had to act according to what the Trust allowed.

A trust, according to the Restatements of Trust and the Alabama Uniform Trust Code, unless the trust specifically overrides such law, is bound by the law imposing fiduciary duties on the trustee. The trustee must act strictly for the benefit of the trust when administering trust property. This duty can be changed, limited or overridden by specific trust language.

The RESTATEMENT (THIRD) OF TRUSTS §§ 76-79 (2008) states, with particularity, what a fiduciary must do. In general, the duties include a duty to act as a reasonable prudent person in administering the trust, act with strict loyalty to the trust, and act with impartiality. These duties override a trustee's duty to carry out the terms of a trust unless the trust language allows a trustee to act outside normal fiduciary duty law.

> A trustee has both (i) a duty generally to comply with the terms of the trust and (ii) a duty to comply with the mandates of trust law except as permissibly modified by the terms of the trust. Because of this combination of duties, the fiduciary duties of trusteeship sometimes override or limit the effect of a trustee's duty to comply with trust provisions; conversely, the normal standards of trustee conduct prescribed by trust fiduciary law may, at least to some extent be modified by the terms of the trust.

Comment b(2) to § 76, subsection 1, RESTATEMENT (THIRD) OF TRUSTS (2008). Alabama cases have recognized the fiduciary duties of trustees. *Bibb v. Pope*, 43 Ala. 190, 1869 WL 499 (Ala.

1869) (holding that husband had fiduciary duties as trustee of wife's property); *First National Bank of Birmingham v. Basham*, 238 Ala. 500, 191 So. 873 (Ala. 1939) (holding that self dealing was improper). The Alabama Uniform Trust Code requires a trustee to act as a fiduciary for the beneficiaries of a trust. ALA. CODE 19-3B-801-818 (2008). The Uniform Trust Code also requires a trustee to act as a reasonable, prudent person in investing the trust assets. ALA. CODE § 19-3B-901(b) provides that the "prudent investor" rule "may be expanded, restricted, eliminated, or otherwise altered by the terms of a trust."

The Alabama Uniform Trust Code at § 19-3B-802(b) states

[A] sale, encumbrance, or other transaction involving the investment or management of trust property entered into by the trustee for the trustee's own personal account or which is otherwise a conflict between the trustee's fiduciary and personal interests is voidable by a beneficiary affected by the transaction unless:
(1) the transaction was authorized by the terms of the trust;
* * *
(4) the beneficiary consented to the trustee's conduct, ratified the transaction, or released the trustee

As stated above Alabama case law prohibits self-dealing unless authorized by a trust and the RESTATEMENT (THIRD) OF TRUSTS prohibits self-dealing as well. Section 77 states

(1) Except as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust solely in the interest of the beneficiaries . . .
(2) Except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests

Did the Tait Trust follow the "default" requirements for trustees or did the Tait Trust have language that varied the trustee's duties? Could Tait execute a mortgage against the Trust property that bound it for his personal debt? The Family Trust instrument does grant the trustee very broad powers and discretion to administer the trust. E.g., Articles IV and V of the L.E. Tait

25

Trust.  However, the Court concludes that these powers are not so extensive that they do away with the fiduciary duties of the trustee or the well-settled rules against self-dealing.  The trust did not "write out" of the Trust the common law rules governing fiduciaries.

URT relies heavily on the Trust provision of Article V that states "[n]o one dealing with the Trustee need inquire concerning the validity of anything he purports to do, or need see to the application of any money paid or any property transferred to or on the order of the Trustee." This provision must be read in light of the entire Trust agreement. *Munger v. U.S.,* 154 F.Supp. 417 (M.D. Ala. 1957).  The Court concludes that this provision did not "override" Tait's fiduciary duties.

When Article V is read in context with the rest of the Trust, it is apparent that the Trust agreement adheres strictly to common law trust rules, including no self-dealing.  Article IV allows the trustee to hold property in virtually any manner he/she chooses "if and as long as the Trustee, in exercising reasonable prudence, discretion, and intelligence, considers that the retention is in the best interest of the trust."(Art. IV, ¶ 1).  It grants the trustee the right to borrow money "for any trust purpose." (Art. VI, ¶ 13).  It authorizes the trustee "[t]o do all the acts, to take all the proceedings, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have, *subject always to the discharge of his fiduciary obligations*." (Art. VI, ¶ 23) (emphasis added).    The instrument states that the trustee is granted broad powers "in order to carry out the purposes of [the] Trust Agreement (Art. IV, ¶ 1). The agreement gives the trustee all powers that the law will allow "that may be necessary to enable the Trustee to administer the trust in accordance with the provisions of the Trust Agreement, subject to any limitations specified in the Trust Agreement." (Art. VI, ¶ 23).  The purpose of the Family Trust is

26

to benefit the income beneficiaries by providing them with income distributions until their death and then the estate is to be distributed to the remaining beneficiaries (the children of the Settlors L. E. and Pauline Tait). In no provision does the Trust authorize the trustee or James Tait to act for the benefit of one beneficiary alone or for the trustee's personal benefit. This trust was created by the Settlors to provide income, maintenance, and support for all of the Tait family.

Second, the paragraph cited by URT is directed at parties dealing with the trustee, NOT at the trustee himself. Article V, paragraph 2, is not a paragraph that empowers or limits the trustee in any way. The court does not see how a paragraph protecting third parties can be read to override a trustee's duties to beneficiaries which, as stated above, are established in other places in the Trust. The Court concludes that this paragraph allows third parties to deal with the trustee without obtaining court approval of a trustee's actions or beneficiaries' consents and without looking behind the trustee's actions to analyze his powers or intentions. Article V, paragraph 2, in effect, incorporates Ala. Code § 19-3B-201(b) into the trust. "A trust is not subject to continuing judicial supervision unless ordered by the court." The Official Comment discusses the fact that trusts are to operate without court supervision in most cases. The Restatement (Third) of Trusts § 71 (2008) states that

> A trustee or beneficiary may apply to an appropriate court for instructions regarding the administration or distribution of the trust if there is reasonable doubt about the powers or duties of the trusteeship or about the proper interpretation of the trust provisions.

The Comment to this section states that courts should not accept requests for instructions on matters within the trustee's discretion because such judicial actions result in increased costs to the trust.

27

The Court believes that the Article V, paragraph 2, should be interpreted as a direction solely to third parties and not to the trustee to preclude unnecessary questioning of the trustee's powers by nonbeneficiaries. The paragraph neither adds nor detracts from the trustee's own duties. The Trust agreement specifically states in separate provisions that the trustee may act in any way to benefit the Trust, as long as he or she uses reasonable prudence and discretion, and as long as the acts are for a trust purpose. (Art. IV ¶¶ 1, 13, 23; Art. V ¶¶ 1, 2, 3).

From the language of the note and mortgage between URT and the evidence produced at trial, it is determined by the Court that the debt was purely a personal, antecedent debt of Tait's. It had no connection to the Family Trust, and, therefore, Tait was not authorized as trustee of the Family Trust to mortgage Dry Fork. His actions violated his fiduciary duty of loyalty and no self-dealing.

## VII. URT Claims

### A. Ratification by Beneficiaries

URT argues that even if Tait was not authorized by the Trust agreement to mortgage Dry Fork, the beneficiaries have ratified his conduct. Such a ratification makes a self-dealing act of a trustee valid under the Alabama Uniform Trust Code, ALA. CODE 19-3B-802(b)(4), and RESTATEMENT (THIRD) OF TRUSTS § 78, comments on sections (1) and (2), c. qualifications and specific exceptions (2008). In order for URT to prove that the beneficiaries ratified Tait's actions, it must prove (1) that the beneficiaries consented to Tait's action and (2) that they had "full knowledge of all the material particulars and circumstances." BOGERT & BOGERT § 942. This "full knowledge" requires not just the facts, but the beneficiaries must also be "apprised of the law" and their rights. *Id.*, citing *In re Cumberland Farms, Inc.,* 284 F.3d 216 (1st Cir. 2002);

Case 08-01015   Doc 32   Filed 09/10/08   Entered 09/10/08 10:45:49   Desc Main
Document      Page 28 of 37

*Adair v. Brimmer*, 1878 WL 12689 (N.Y. 1878). Given the arguments of URT, the Court questions which act URT claims was ratified. URT argues that (1) Tait took unauthorized funds from ARIC and URT and used them for the benefit of the Family Trust, and (2) that Tait was authorized to mortgage the Family Trust as its trustee. The Court determines that neither of these two acts were ratified by the beneficiaries.

First, Tait admitted that he misappropriated funds from URT and ARIC. He testified to this at trial, and it is evidenced by his execution of the note and mortgage to URT. Although URT proved at trial that monies were taken from various corporate accounts and deposited into the Tait Advisory Services account, the Court concludes it did not prove that these amounts went to the Family Trust. The amounts of the withdrawals and deposits were different, as, in many cases, were the transaction dates. While it is possible that URT is correct that Tait took the company's money and used it to benefit the Family Trust, it was only proven that Tait took the money and put it in other accounts to which he had access. Furthermore, the beneficiaries did not know of any of this conduct until July or August of 2007, right before Tait filed his bankruptcy petition. The testimony at trial was that Tait held a family meeting after the foreclosure notice on the property was published. He stated that he informed his family of the mortgage and that his interests might differ from theirs and that he should probably resign as trustee. There was never any testimony that the beneficiaries knew he had misappropriated funds or that any of these funds were used to pay for the renovations to Dry Fork. It appears from all evidence presented that the beneficiaries were unaware that Tait's misconduct and debt had any possible relation to the renovations of the Trust property. Therefore, without proof of their

knowledge of the facts, the beneficiaries cannot be said to have ratified Tait's acts in taking funds from URT.

As to the possible ratification of the URT mortgage, the Court concludes that the beneficiaries could not have done more than they did under the circumstances. The facts show no knowing ratification of Tait's actions. There was no proof of knowledge of James Tait's execution of a mortgage by Deborah Tait, Pauline Tait or Suellen Tait. At best, they learned of the mortgage in July 2007. Tait filed bankruptcy in August of 2007. He resigned voluntarily from his position as trustee of the Family Trust in December 2007, so the beneficiaries did not need to make clear that he should no longer be trustee. He took that action himself Tait does still live at Dry Fork. Is the fact that the other beneficiaries have not required him to leave the premises a ratification of his actions? The family needs someone to maintain Dry Fork and Tait is doing that at no cost to the trust. Without him, the trust would have to pay for the property expenses itself. Second, he is a remainderman under the Trust and the other remaindermen, Deborah and Suellen, also live on Trust property. Therefore, his behavior is no different than the other remaindermen except that he is paying for the upkeep of the Trust property on which he resides. Therefore, his living arrangements do not evidence ratification. Third, the successor trustee did file this adversary proceeding against Tait, as the former trustee, and URT. The suit does not evidence ratification of Tait's actions. URT argues that the beneficiaries "changed nothing" after learning Tait granted the mortgage. However, the Court finds that they took all the reasonable actions available under the circumstances. None of the actions or inactions taken by the beneficiaries after July of 2007 equate to consent, much less ratification.

### B. Equitable Remedies

30

Although not specifically plead in its complaint, URT, in its post trial briefs and arguments to the Court, seeks equitable remedies in the event that the Court concludes, as it has, that the mortgage is invalid and Tait's acts were not ratified by the beneficiaries. The Court will address these issues although the Plaintiffs and James Tait assert that the equitable remedies cannot be granted since not properly pled. The plaintiffs and James Tait are correct that URT did not seek equitable remedies in its Answer and Counterclaim. However, case law indicates that allowing URT to, in essence, amend its complaint to include the request for equitable relief should be allowed when the same evidence would be used to support the claims and the same measure of damages would apply to each claim if URT were successful. *Janis v. Kansas Elec. Power Co.,* 99 F.Supp. 88 (D. Ks. 1961); *Porter v. Theo J. Ely Mfg. Co.*, 5 F.R.D. 317 (W.D. Pa. 1946) (stating "[i]f the facts alleged show, substantially, the same wrong with respect to the same transaction, or if it is the same matter more fully and differently laid, or if the gist of the action, or the subject of the controversy remains the same . . . the amendment should be permitted."). The Court concludes that the equitable relief requested should be considered.

1.

Constructive Trust

URT claims a right to a "constructive trust" as to the amount of the mortgage debt. Under Alabama case law, a constructive trust should be imposed by a court if

> [L]egal title to property . . .has been obtained through actual fraud, misrepresentation, concealments, or through undue influence, duress, taking advantage of one's weaknesses or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest.

*Radenhausen v.Doss*, 819 So. 2d 616, 629 (Ala. 2001) (quoting Knowles v. Canant, 51 So.2d

31

355, 357 (Ala. 1951). Tait admits he wrongly took the money from URT's account. That is why he settled with URT . However, URT must trace the money into Dry Fork if it wishes to impose a constructive trust.

> It is a general rule in most jurisdictions that if the funds of one person are wrongfully used by another in the purchase of real estate in his own n[a]me, or in the improvement of his real estate, a constructive trust in the property purchased or improved will arise in favor of the one whose money was wrongfully used.

*Costell v. First Nat'l Bank of Mobile*, 150 So.2d 683, 686 (Ala. 1963). Tait admitted that he took the money and used most of it to pay Vesta for Tait Advisory Services. URT tried to trace some of the funds from URT's account to Dry Fork, but the evidence was insufficient to prove that the money was used for that purpose. Tait put the funds in several of his accounts. He used the accounts to pay bills. Some of those bills pertained to the property and some did not. The accounts also had other funds in them. With the comingling of funds and other expenses, the Court concludes that the URT monies cannot be traced to Dry Fork.

There is another reason that this equitable remedy must fail. It is a longstanding rule that equitable remedies require "clean hands." URT cannot claim "clean hands" and good faith in this case. URT knew at the time it entered into the note and mortgage with Tait that the property sought to secure his debt was property of the Family Trust. Furthermore, URT's and ARIC's attorneys reviewed the entire Family Trust agreement. It is clear from the trust instrument that the Family Trust holds title to Dry Fork and that Tait only has powers to borrow money, encumber, or mortgage the property for a trust purpose, (Art. VI, ¶ 13), and that Tait, as trustee, was authorized "[t]o do all the acts, to take all the proceedings, and to exercise all the rights, powers, and privileges which an absolute owner of the property would have, *subject always to*

32

*the discharge of his fiduciary obligations*." (Art. VI, ¶ 23) (emphasis added). This is not an instance of a misunderstanding between laymen; the settlement, note, and mortgage were created and executed by attorneys (including Tait). Despite which trust law was in effect at the time, all attorneys know of the strict fiduciary duties of trustees, and if there was any doubt, the Family Trust instrument itself explained the trustee's duties, obligations, powers, and limitations. URT was not without knowledge of any of the provisions in the Family Trust instrument.

URT's claims for a constructive trust must be denied. URT knew the risk it ran in taking the mortgage. URT knew that Tait was a trustee of the Trust and did not own the Trust property himself.

2.

Equitable Mortgage

For an equitable mortgage to exist, (1) the mortgagor must have a mortgageble interest in the property the mortgagee seeks to impress with a lien; (2) there must be a definite debt that is owed; (3) the amount of the debt must be ascertainable; and (4) the intent of the parties to create a mortgage or lien must be clear. *Union Planters Bank, N.A. v. New York*, 2008 WL 2232647 (11th Cir. 2008) (citing *Barnett v. Waddell*, 248 Ala. 189, 27 So.2d 1 (Ala. 1946)).

"In order for an equitable mortgage to exist, it is essential that the mortgagor have a mortgageable interest in the property to be charged as security." *Union Planters Bank, supra.* at 2008 WL 2232647 *1. Tait, as explained above, did not have the capacity to mortgage the property as a trustee. But, in light of his self-settled remainder interest which is not subject to the spendthrift clause, did he have a personal mortgageable interest?

33

Tait has a vested remainder in the trust. He will take full title to 1/3 of the remainder of the trust on the death of his mother. His interest is contingent upon James Tait surviving Pauline Tait. However, this contingency does not make the interest contingent. The case of *In re Will of Uchtorff*, 693 N.W.2d 790, 793 (Iowa. 2005), describes the difference between a vested and a contingent remainder.

> A vested remainder, whereby the estate passes by the conveyance, but the possession and enjoyment are postponed until the particular estate is determined, is where the estate is invariably fixed to remain to certain determinate persons. Contingent remainders are where the estate in remainder is limited to take effect either to a dubious or uncertain person or upon a dubious or uncertain event, so that the particular estate may be determined and the remainder never take effect.

Based upon this definition, Tait has a vested remainder interest. "A remainder may be vested even when enjoyment is postponed until the happening of some future condition." *Id.* A vested remainder interest "may be alienated or conveyed by the remainderman, even though the remainder is subject to be divested." CORPUS JURIS SECUNDUM, Estates, § 105 entitled "Sale or conveyance of vested remainder." Also, "a vested remainder may be mortgaged during the continuance of the preceding estate." CORPUS JURIS SECUNDUM, Estates, § 111 entitled "Mortgages" (2008); *Pinnell v. Dowtin*, 224 N.C. 493, 31 S.E. 2d 467, 469 (N.C. 1944) (holding " a vested remainder . . . may be aliened . . . much in the same manner as an estate in possession"). Therefore, Tait had a mortgageable interest in his trust interest and he could alienate or encumber that remainder interest (to the extent it is not subject to the spendthrift clause). The first requirement for an equitable mortgage is met.

34

Tait admitted he owed over $980,000 to URT before the settlement was signed and agreed to the "mortgage" to secure $980,000 of the debt. Therefore, the second and third requirements of the test of an equitable mortgage is met.

Finally, Tait and URT intended to establish a lien on Tait's interest in Dry Fork when the "mortgage" was executed. Tait wanted to resolve his legal difficulties with URT.

All four requirements of an equitable mortgage have been met in this case. Because Tait does have a vested remainder interest, a present, mortgageable property interest, in his self-settled contribution to the Trust, the Court, on equity principles, must impress a lien of $980,000 on his remainder interest. The lien is not a mortgage on Dry Fork per se, but a lien, enforceable against Tait's remainder interest in the Trust upon the death of Pauline Tait (to the extent of his self-settled interest).

The doctrine of "clean hands" does not operate to defeat this interest as it would a constructive trust. As to Tait's self-settled interest, URT does not have unclean hands. Although it knew of the Trust, it had a right to assume it might obtain a lien on Tait's vested remainder to the extent of his self-settled interest when Tait offered a mortgage on part of the Trust to settle serious allegations against him. For Tait to deny URT a right to claim a lien against his self-settled interest would be doing precisely what the case law on self-settled contributions to trusts states is wrong–using the trust as a "shield" against his own creditors. Official Comment to the Uniform Trust Code, Section 505 (as contained in Ala. Uniform Trust Code § 19-3B-505 (2008)).

CONCLUSION

35

Tait is a settlor of the L.E. Tait Trust to the extent of his contribution to it for the improvements to Dry Fork. As a settlor, his interest in the trust, to the extent of his contribution to it, is not protected by the spendthrift provision of the Trust. However, the trust provisions do apply to determine when and how a creditor can reach James Tait's interest. As a remainderman only, his interest is not distributable to him until the death of his mother, Pauline Tait. That interest is property of his bankruptcy estate pursuant to 11 U.S.C. § 541(c)(1).

Tait attempted to mortgage Dry Fork, Trust property, as a partial satisfaction of a personal debt. That mortgage is void or invalid under the trust law and principles followed by Alabama courts. The mortgagee, URT, cannot claim a constructive trust on any of the Trust property, including Dry Fork, but can claim an equitable lien on James E. Tait's remainder interest in the Family Trust.

THEREFORE IT IS ORDERED AND ADJUDGED that Plaintiffs, Amelia Tait Driscoll, Pauline Tait, Suellen Tait and Deborah Tait are awarded judgment against the Defendants, James Tait and Ultimate Reserve Trust, declaring that the mortgage executed on November 17, 2006 by James E. Tait (individually and as trustee) and Gail P. Tait, mortgagors, in favor of Ultimate Reserve Trust against the property legally described as:

> NW 1/4 of Section 27; NW 1/4 of SW 1/4 of Section 27 all in Township 11 North, Range 7 East, except all south of Greenville and Black's Bluff Road in East half of NW 1/4 of Section 27, all in Township 11 North, Range 7 East, Containing 165 acres, more or less

is void and of no effect and awarding Defendant, Ultimate Reserve Trust, an equitable lien of $980,000 against the self-settled remainder interest of James E. Tait (or such lessor amount as

Case 08-01015   Doc 32   Filed 09/10/08   Entered 09/10/08 10:45:49   Desc Main
Document   Page 36 of 37

constitutes the lienable portion of James E. Tait's remainder interest) in the L.E. Tait Trust to the extent of his self-settled interest in it.

Dated:    September 10, 2008


_Margaret A. Mahoney_
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE